**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MICHAEL HASHER, et al., | : | |
| | : | Civil Action No. 07-1212 (SDW) |
| Plaintiffs, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| JON CORZINE, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WIGENTON**, District Judge:

Presently before the Court is Defendants' motion for summary judgment.   (ECF No. 145).

Also before this Court is Plaintiff's response and counter-motion for summary judgment (ECF No.

148), to which Defendants have responded.   (ECF No. 150).   Plaintiff has also filed two letter

replies.   (ECF Nos. 151-52).   For the following reasons, this Court will grant Defendants' motion

for summary judgment, deny Plaintiff's counter-motion for summary judgment, and will dismiss

the fictitious Defendants from this action.


## I.  BACKGROUND

## A.  Procedural History

Because the procedural history of this matter is complicated and determinative of what

claims remain before the Court at this time, the following summary of the procedural history of

this matter is necessary to provide some context to Plaintiff's claims.   Plaintiffs Michael Hasher,

Joseph Fournier, Robert Deavers, Richard Bagarozy, and Joseph Aruanno originally filed this

matter on or about March 12, 2007.   (ECF No. 1).   All of these men were at the time, and by all

appearances continue to be, civilly committed as Sexually Violent Predators (SVPs) under New Jersey's Sexually Violent Predator Act (SVPA or SVP Act), N.J. Stat. Ann. § 30:4-27.24, *et seq*. (ECF No. 1).   Plaintiffs named as Defendants in this matter then Governor of New Jersey Jon Corzine, George Hayman who was at the time commissioner of the New Jersey Department of Corrections (DOC), former DOC commissioner Devon Brown, Kevin M. Ryan who was then commissioner of the New Jersey Department of Human Services (DHS), Alan G. Kaufman who was director of the Division of Mental Health Services (DMHS) within the DHS, then CEO of the DMHS John Main, then Director of Operations for the DOC William Plainter, Grace Rogers who was at the time administrator of the Special Treatment Unit (STU) in which the Plaintiffs were confined, then Assistant Administrator of the STU Paul Lagana, STU Clinical Program Director Glen Ferguson, Director of the STU's Psychology Department Merrill Main, and numerous John Does.  (*Id.*).   Following an order entered by Judge Cavanaugh administratively terminating this matter for failure to pay the necessary filing fees or file applications to proceed *in forma pauperis*, all of the Plaintiffs except Joseph Fournier filed complete *in forma pauperis applications*, and this matter was deemed filed.   (ECF Nos. 6-9, 14-15).   Plaintiff Fournier chose to withdraw from this matter instead of filing such an application, and thus ceased to be a party to this case in April 2007. (ECF No. 10).

On July 26, 2007, Judge Cavanaugh entered an order and opinion screening Plaintiffs' complaint.   (ECF Nos. 14-15).   In his screening opinion, Judge Cavanaugh construed Plaintiffs to be raising the following claims: Fourteenth Amendment claims in which Plaintiffs alleged that various conditions of their civil commitment amounted to improper punishment and were violative of both the Due Process and Equal Protection Clauses; claims that Plaintiff's Fourth Amendment

rights had been violated by improper searches and seizures; and several facial and as applied constitutional challenges to the SVPA in which Plaintiffs claimed that the SVPA was an improper ex post facto punishment, that the SVPA violated Double Jeopardy protections, that the SVPA violated their rights against self-incrimination under the Fifth Amendment, that the SVPA was overly broad and vague, and that the SVPA violated Plaintiffs' right to a jury trial.   (ECF No. 14 at 18-42).   Judge Cavanaugh dismissed all of Plaintiffs' as applied and facial constitutional challenges, and permitted only Plaintiffs' Fourteenth Amendment and Fourth Amendment claims to proceed in his screening opinion and order.   (*Id.*; ECF No. 15).   Each Plaintiff thereafter filed motions for the appointment of counsel, which were denied.   (ECF Nos. 47-53).

Following their answer, Defendants eventually filed a motion requesting that this matter be consolidated with *Alves v. Ferguson*, Docket No. 01-789, an ongoing class action in which numerous SVPs, including Plaintiffs, sought to challenge their commitment and the treatment they received during that commitment.   (ECF No. 58).   On June 4, 2008, Magistrate Judge Falk granted that motion, and consolidated this matter with *Alves*.   (ECF No. 61).   Judge Cavanaugh ultimately affirmed that consolidation (ECF No. 67), and the Third Circuit dismissed Plaintiff Joseph Aruanno's appeal of that order.   (ECF No. 72).

The Alves matter proceeded for several years, and ultimately ended in a settlement of all of Plaintiffs' claims regarding the adequacy of their psychological treatment at the STU, which was approved by Judge Cavanaugh.   *See Alves v. Main*, No. 01-789, 2012 WL 6043272, at *23 (D.N.J. Dec. 4, 2012).   Several Plaintiffs appealed that approval, and the Third Circuit affirmed on March 20, 2014.   *Alves v. Main*, 559 F. App'x 151 (3d Cir. 2014).   In approving the settlement, the Third Circuit found both that the settlement fairly dealt with all treatment related

claims between Plaintiffs and the DHS, as well as that Plaintiff Joseph Aruanno's assertion that his claims should not have been consolidated and that his treatment in the STU was unconstitutional were without merit or had not been properly raised below.   *Id.* at 156.

In April of 2014, Plaintiff Joseph Aruanno filed a motion requesting that those of his claims filed in the *Hasher* action that were not the subject of the settlement in *Alves* be revived and severed from the settled class action.   (Docket no. 01-789 at ECF No. 236).   On May 19, 2014, this Court granted that motion.   (ECF No. 76).   In granting that motion, this Court specifically found that the *Alves* settlement, although it had dealt with all of Plaintiffs' remaining claims against the DHS Defendants, had not "encompassed all of Plaintiff[s'] claims against officials of the [DOC] concerning the facilities, living conditions, and security measures at the STU" and thus revived this action and reinstated Plaintiffs' Fourteenth and Fourth Amendment claims against the DOC Defendants.   (*Id.* at 2).   Following the re-opening of this matter, all Plaintiffs other than Plaintiff Joseph Aruanno withdrew or were dismissed from this matter.   (ECF Nos. 108, 119, 127).   Thus, as of the filing of the summary judgment motions, only Plaintiff Joseph Aruanno, the fictitious Defendants, and the DOC Defendants remain in this action.

**B.  Factual Background**

The following factual recitation is drawn from Plaintiff's deposition and the documents submitted by Defendants with their motion for summary judgment.   The sole remaining Plaintiff in this matter, Joseph Aruanno, is currently civilly committed to the Special Treatment Unit as a sexually violent predator pursuant to the SVP Act.   (Plaintiff's Dep., Document 5 attached to ECF

No. 145, at 4).[1]   Petitioner's commitment arose out of his most recent criminal conviction, a 1998

conviction for sexual assault based on Plaintiff's "fondling a female . . . between her legs and

[running] away."   (*Id.*).   Plaintiff, however, continues to profess his innocence of that crime.

(*Id.*).

During his deposition Plaintiff discussed the nature of his current claims.   First, Plaintiff

suggests that the STU's rules, as set forth in the facilities orientation rule books, are enforced

arbitrarily.   (*Id.* at 6).   In support of this assertion, Plaintiff stated that ice from the facility's ice

machine is not evenly distributed, with some SVPs receiving more or less ice, sometimes based

on preferential treatment by the officers of the facility.   (*Id.*).   Plaintiff also suggested that

haircuts are not always available either because hair care products and hair clippers are broken or

unavailable, or because Plaintiff has not bribed the resident employed as the facility's barber with

cigarettes, and that resident in turn refuses to give him a haircut.   (*Id.*).

In addition to suggesting that the rules are arbitrarily enforced, Plaintiff also asserts that

some of the rules are themselves overly restrictive.   First, Plaintiff takes issue with the fact that

the rules prevent him from operating a business on his own.   (*Id.*).   Plaintiff further states that his

inability to operate his own business is especially troublesome in so much as he is denied a job by

the STU because he refuses to participate in group therapy because he asserts that he has nothing

to talk about because he is innocent of sexual assault.   (*Id.*).   Plaintiff also takes issue with his

being denied the ability to own a cellphone, claiming that this rule denies him the ability to contact

---

[1]  All page number citations referencing Plaintiff's deposition refer to the page numbers on the
bottom left of each page, rather than to any of the four smaller "pages" which appear on each
transcript page.

friends, family, and prospective attorneys because the eight to twelve[2] pay phones are frequently abused by other detainees' over use of the phone.   (*Id.* at 6-7).   Plaintiff further states that he is denied the ability to own a private computer, even without a modem, which he asserts would provide him greater access to legal research and access to e-mail.[3]   (*Id.* at 7).   Plaintiff acknowledged, however, that his unit does have three computers, but they are available for an hour or so a day when therapeutic or educational computer groups are permitted.   (*Id.*).   Plaintiff is apparently not permitted to be part of such groups, however, because of his treatment-refusal, and in any event contends that this computer time is not shared equally as certain favored inmates are given more time than others.   (*Id.* at 7-10).   Although Plaintiff's conviction is nearly twenty years old, he continues to contend that he has some form of appeal pending, and thus refuses to attend group because he would have to admit to his crime, which he believes violates his right to be free from self-incrimination, a claim which Judge Cavanaugh has previously dismissed in this matter. (*Id.* at 9-10).

Although Plaintiff asserts that he should be permitted to have a computer and a private cell phone, he admitted in his deposition that the facility had a strong interest in preventing SVPs from owning such devices.   Plaintiff specifically recognized that many inmates use the phones in attempts to defraud private companies and individuals, and to pester and harass people outside the

---

[2] There are apparently twelve phones in Plaintiff's unit, but two to four of the phones are often broken.   (*Id.* at 6-7).   These twelve phones are shared by approximately eighty residents.   (*Id.* at 7).

[3] Although Plaintiff states that he wants to own "a computer without a modem," both of the uses he states he would put such a computer to, legal research or e-mail, generally require access to either the internet at large or a local network with the applicable legal materials, both of which would require a modem.

STU, including children.   (*Id.*). Plaintiff also admitted that many of the inmates have histories of child pornography charges, and suggested that it would be proper to block those individuals from having computer access.   (*Id.*).

Plaintiff next took issue with the fact that, during several of his transfers within the STU, he was permitted to bring only four boxes of property, and was required to discard the rest.   (*Id.* at 7-8).   Plaintiff's moves, first from the Kearney version of the STU to the version of the STU adjacent to Eastern State Prison, and then to another building within the ESP STU, however, took place in 2009 and 2010, several years after the filing of this complaint.   (*Id.* at 8).

Plaintiff also complained about his being put on Modified Activities Program or "MAP" status.   According to the resident handbook provided in this matter, MAP status is "a component of the clinical treatment at the STU that focuses on stabilizing and enhancing control of disruptive or dangerous behaviors."   (Document 7 attached to ECF No. 145 at 43).   SVPs are placed on MAP status when their "internal behavioral controls deteriorate such that they pose a threat to the safety of Residents [or] staff, or [their actions] warrant increased external control[]" over their behavior.   (*Id.*).   Thus, under the MAP program, a committee's privileges are curtailed when his behaviors impugn the ability of staff to treat the residents of the STU.   (*Id.*).   Thus, as the handbook explains,

> MAP consists of four distinct levels: Room, Tier, Wing, and Program.   Room, Tier, and Wing restrict the unescorted motion of a Resident to those respective areas.   Such restrictions are implemented subsequent to behaviors that pose a danger to self or others.   The degree of restrictions of unescorted motion will be commensurate with the apparent danger.   The levels of MAP represent increasing return of privileges culminating in return to the general STU population with all privileges reinstated.

(*Id.*).   Thus, MAP placement is essentially designed to control anti-social or dangerous behavior,

and the program is designed to help the STU resident to regain his self-control and avoid such behavior in the future.   (*Id.* at 43-44).   Those placed on MAP status have that status reviewed by treatment personnel, who ultimately determine when the resident moves to less restrictive levels of MAP status.   (*Id.* at 44).

Plaintiff's essential complaint with MAP status appears to be that it is punitive in nature and not entirely dissimilar to prison disciplinary confinement.   (Plaintiff's Dep. at 10-11).   Plaintiff essentially asserts that MAP "seems to be more [like a] DOC" punishment than treatment as it includes lock up components.   (*Id.*).   Plaintiff further takes issue with his history of being placed on MAP status based on reports issued by several officers who he asserts were themselves abusive.   (*Id.*).   Each of the incidents about which Plaintiff complains as resulting from wrongful action by a DOC officer, however, occurred in 2008 or thereafter by Plaintiff's own admission, and thus post-date his current complaint.   (*Id.* at 11).   Plaintiff specifically states that he was attacked by certain officers in 2008, and was falsely accused of posting papers asking his fellow SVPs to strike that same year, resulting in his being on MAP status between 2008 and 2009.   (*Id.* at 10-11).   Although Plaintiff also asserts that he has been assaulted at other times, he asserts that there was no "paper trail" for these events.   (*Id.* at 11).   Plaintiff further claims that several guards have gang affiliations, and are the source for many of the drugs and cigarettes illegally smuggled into the STU.   (*Id.* at 13).   Plaintiff also asserts that guards would call he and other inmates names like "tree jumper" or "baby raper" at times.   (*Id.* at 29).

Although Plaintiff alleges that he suffered from some racism from DOC staff, none of these allegations are directed toward the Defendants in this case.   (*Id.* at 13-14).   Instead, he asserts that certain guards and an administrative official, Sara Davis, who is not a party to this action,

were responsible for some of these issues.  When asked specifically about Defendants Lagana,

Brown, Hayman, and Rogers, Plaintiff acknowledged having sent some unspecified remedy forms

to some of these individuals, but stated that he did not have any claims of racism or the like on

their part.  (*Id.* at 13-14).  As to Defendant Brown, Plaintiff asserted only that Brown had not

taken action after unspecified remedy requests.  (*Id.* at 13).  As to Rogers, Plaintiff asserted that

he may have met her a couple of times, and had complained to her about his inability to have a job

due to treatment refusal and his lack of access to law libraries, paper, and pens, but didn't receive

a response to his satisfaction to his complaints when he asked her about them.  (*Id.* at 14).  As to

Lagana, Plaintiff stated that he was "one of the good ones" who tried to help Plaintiff when he

could, but could not solve the problems which Plaintiff stated were "over his head."  (*Id.*).  As to

William Plantier, Plaintiff stated that any complaints about him were from former Plaintiffs

Bagarozy and Hasher, and that he himself had no prior history or dealings with Plantier.  (*Id.*).

As to George Hayman, the previous commissioner of the DOC, Plaintiff states only that he wrote

letters to him, but had never met or dealt with him otherwise.  (*Id.* at 15).  During the deposition,

Plaintiff seemed to suggest that most of his issues were with Merril Main and the DHS staff, rather

than the DOC Defendants, despite the fact that only his claims against the DOC remain in this

action following the *Alves* settlement.  (*Id.*).

     Although Plaintiff next complains about the past destruction of his legal papers, those

claims, too, did not arise until after the filing of this complaint.  (*Id.* at 16).  Specifically, Plaintiff

again complains about the four box paper limit, but also asserts that, in 2009, an officer destroyed

much of his legal papers by pouring water upon them.  (*Id.*).  Plaintiff also stated that an officer

at some point destroyed his drums by pouring water upon them and soaking them.  (*Id.*).  Plaintiff

also asserted that, in 2008 and 2009, he had been subject to random and improper searches by a guard who had issues with him, and had been beaten and assaulted by other guards for no apparent reason.   (*Id.* at 16-19).   Plaintiff also stated that guards during 2008 and 2009 read his legal paperwork which was stored in his personal files in his room.   (*Id.*).   Plaintiff also asserted that, in 2008, a guard and an inmate conspired against him based on his reporting them for bringing in contraband, but did not provide clear details about what occurred stating only that an officer Bosak was involved in the incident.   (*Id.* at 22).   Plaintiff also claimed that a property room officer named Moody in September of 2009 gave out some of his property to other SVPs.   (*Id.* at 23).

Plaintiff next claimed that, following his alleged assault by a guard in 2008, officers of the STU's special investigation division failed or refused to investigate his claims.   (*Id.* at 24). Plaintiff specifically contended that an investigator named Madden came to investigate and concluded that no assault by the guards had taken place, and that Plaintiff had struck a guard based on blood on his hands, which Plaintiff asserts came from his own wounds.   (*Id.*).   Plaintiff also alleged that Madden refused to speak with his witnesses, and that Madden's report regarding Plaintiff having assaulted a guard was later used against him during a custody review hearing. (*Id.* at 24-25).   Plaintiff also asserted that he had been retaliated against and denied shampoo on other occasions by an Administrator Sweeney, who is not a Defendant here, and by Merrill Main, based on the allegation that he had attacked a guard in 2008.   (*Id.* at 25).

In his deposition, Plaintiff next turned to his allegation that his confinement was less a therapeutic environment, and more like a prison.   Plaintiff asserted that the building in which he is housed was formally a prison lock-up facility, and that the addition of tables and the like by SVPs has not improved the space.   (*Id.* at 26).   Plaintiff further asserted that, unlike prisoners,

SVPs are not provided proper libraries, including a law library.   (*Id.*).   Plaintiff also claimed that the STU is like a prison because of the behavior of the residents, including the smashing of TVs in common areas, loud activity while he tries to sleep, and the like.   (*Id.*).   Essentially, Plaintiff's major complaint is a lack of privacy and open space.   (*Id.* at 26-27).   As to the prior facility, in Kearney, Plaintiff stated only that that facility had fire code issues and as a result had construction issues which forced people out of their rooms at 7:30 each morning.   (*Id.* at 27).   Plaintiff further took issue with the razor wire and other security features designed to prevent escapes from the STU, which he asserted were not in place at other civil commitment facilities in New Jersey.   (*Id.* at 28).   Although he claimed these were excessive, Plaintiff acknowledged that there are some "real monsters living in" the STU.   (*Id.*).   Plaintiff also alleged that the prison-like treatment also occurred during transportation to outside facilities, as SVPs are placed in shackles while outside the facility.   (*Id.* at 29-30).   Again, Plaintiff stated that he "totally underst[ood that] there'[re] dangerous people" in the STU, but that he felt the shackles were excessive when applied to him. (*Id.* at 30).   Plaintiff further stated that, although he disliked the razor wire and security features, the SVPs, himself included, wanted to get out of the facility and that would lead some to want to escape.   (*Id.*).   Petitioner also claimed that lengthy lockdowns over minor security issues were a frequent issue.   (*Id.* at 32).

Plaintiff also asserted claims regarding the nature of the treatment offered him at the STU. Plaintiff first suggested that the purposes of treatment were negatively affected by the presence of guards, one of whom would sit in on group therapy sessions for safety purposes.   (*Id.* at 33). Plaintiff also asserted that group therapy in and of itself did not serve his treatment purposes, and that he should instead be provided with one on one treatment, a suggestion he has apparently made

to DHS officials including Merrill Main, although Plaintiff recognized that that issue was subject to the settlement in *Alves*.   (*Id.*).   Plaintiff also asserted that his treatment had been negatively impacted when the STU stopped putting up Christmas decorations following complaints by Muslim committees.   (*Id.*).

Plaintiff then turned back to his claims that certain pieces of his property had been damaged or lost by the facility's guards.   (*Id.* at 34).   Plaintiff asserted that he has purchased several typewriters as none are provided in the law library, and he has found those typewriters broken after searches of his room by STU guards.   (*Id.*).   Plaintiff also reasserted that his drums and paperwork had been damaged during a search of his cell, and claimed that the perpetrators had not been held accountable for the destruction of his property.   (*Id.*).   Plaintiff also asserted that many of the searches were conducted by the facility's Special Operations Group, who often appear for random searches in riot gear, lock down the facility, and search the cells of the SVPs.   (*Id.* at 34-35).   Plaintiff also claimed that these searches are, at least in theory, conducted to combat the presence of drugs, tobacco, and pornography in the STU, all of which are prohibited in the facility. (*Id.* at 35).   In searching for these things, however, Plaintiff states they often roughly treat the property of the civil committees, and thus break DVD players and the like.   (*Id.*).   Plaintiff also asserted that the visitor policies are more relaxed at other state psychiatric hospitals and that he was told by an employee of the STU that the Ann Klein and Ancora facilities offer daily visitation, a benefit the DOC has told Plaintiff they cannot provide based on staffing and funding issues.   (*Id.* at 41).

Plaintiff next claimed that he has had issues with family visits.   (*Id.* at 38).   Plaintiff asserted that the rules for visitors – requiring long sleeved shirts and the like – are somewhat

12

arbitrarily enforced and that family members are sometimes harassed by guards.   (*Id.*).   In making that claim, however, Plaintiff acknowledged that some of the rules and the "harassment" arose out of efforts to curtail the smuggling of contraband into the facility through visitors.   (*Id.*). Because of these rules and the alleged unspecified further harassment, Plaintiff asserts that his family members have not visited him for a significant period of time.   (*Id.*).     Plaintiff also took issue with the lack of privacy in making phone calls both to family and to outside attorneys.   (*Id.* at 39).   Plaintiff's final visitor/family related claim was that he had had pictures of young family members, such as a picture of his sister's baby, confiscated by STU guards because his sexual offenses involved children.[4]   (*Id.*).

Plaintiff next asserted that he had been denied the ability to hire a private doctor or dentist to treat his illnesses and wounds.   (*Id.*).   Plaintiff asserted that this presented a problem after he had his tooth "knocked loose" by an officer's attack in 2009 because the facility only offers limited dental time, and he was frequently "bumped" for committees with more serious dental issues. (*Id.*).   He therefore offered to see his own doctor or dentist, but that request was denied.   (*Id.*). Plaintiff also stated that this issue had come up in the *Alves* case and had been raised before the special expert in that case.   (*Id.* at 39-40).   Plaintiff also asserted, however, that he has frequently asked the Public Defender's Office to hire additional outside psychiatrists to perform evaluations to aid him in securing his release in his annual custody review hearings because the normal experts used by the State and Public Defender are "hired guns" who are less capable than private experts,

---

[4] Although Petitioner took issue with the seizure of his niece/nephew's photo, he conceded that he had not had any issues with staff opening his incoming mail outside of his presence, and understood the need for such tactics in any event.   (*Id.*).   He thus "conceded" that claim for the purposes of this case.   (*Id.*).

such as the doctor assigned as a special expert in the *Alves* matter.   (*Id.* at 40).   Plaintiff claims that he also raised this issue with Merrill Main, but Dr. Main refused the request for outside psychological treatment and evaluation.   (*Id.* at 40-41).   Petitioner also admitted that Main was the only one of the Defendants named at any point in this matter with whom he raised this issue. (*Id.* at 41).

At the conclusion of his deposition, Plaintiff was asked whether he had raised the issues about which he complains with the remaining DOC Defendants.   (*Id.* at 43-44).   Plaintiff asserted that he had raised these issues with the commissioners of the DOC and with various attorneys general, and had filed numerous other actions raising other claims in 2004, 2007, and thereafter. (*Id.*).   When asked specifically if the remaining DOC Defendants (Brown, Hayman, Lagana, Plantier, and Rogers) were personally involved in the alleged violations, Plaintiff responded "[n]ot that I'm aware of, no, I don't believe so."   (*Id.*at 44).   Plaintiff clarified that they had only been named based on their decision-making "or lack [there]of" and not based on personal involvement in any beatings, cell searches, or lock ups about which Plaintiff complains.   (*Id.*).   Although Plaintiff again asserted that he had discussed the 2008 beating he received from Officer Booker with Lagana, Plaintiff admitted that anything which occurred with Booker was not the result of "a real deliberate action on [Lagana's] behalf."   (*Id.*).   Plaintiff did assert, however, that Booker, Cruz and Caldwell's actions in 2008 and 2009 had been raised to commissioners Hayman and Brown via letter writing campaigns, and that Lagana or Rogers should have known about other issues because Plaintiff filed other lawsuits regarding those claims.   (*Id.* at 45).   Plaintiff, however, provided no more specific details about raising these issues to the attention of DOC personnel.   (*Id.*).

14

## II.  DISCUSSION

### A.  Legal Standard

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party."  *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *Id.*, but must not make credibility determinations or engage in any weighing of the evidence.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial."  *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion.  *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp.

3d 546, 550 (D.N.J. 2014).   "A nonmoving party has created a genuine issue of material fact if it

has provided sufficient evidence to allow a jury to find in its favor at trial.   However, the party

opposing the motion for summary judgment cannot rest on mere allegations, instead it must present

actual evidence that creates a genuine issue as to a material fact for trial."   *Serodio*, 27 F. Supp.

3d at 550.


### B.   Plaintiff's Motion for Summary Judgment

In response to Defendants' motion for summary judgment, Plaintiff filed a brief counter-

motion for summary judgment.   In support of his contention that he is entitled to summary

judgment, Plaintiff provides no more than the docket numbers of other cases, including *Alves*,

which he suggests establish the particular violations he is asserting in his complaint.   Plaintiff

provides no statement of material facts nor any factual documentation in support of his claims

whatsoever.   Plaintiff has thus failed to comply with the requirements of Local Civil Rule 56.1(a),

which requires both movants and opponents in summary judgment motions to submit a statement

of material facts.

While Federal Courts "have traditionally given *pro se* litigants greater leeway where they

have not followed the technical rules of pleading and procedure," *Folsom v. Superior Court of

New Jersey, Middlesex Vicinage*, No. , 2008 WL 1782236, at *4 (D.N.J. Apr. 17, 2008) (quoting

*Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993)), that leeway is not unlimited.   Thus, while the

Courts may excuse a non-movant *pro se* party's failure to provide a statement of material facts and

may refuse to deem a moving party's statement unopposed following the non-movant's failure to

file a counter-statement of facts, *see, e.g., Artis v. McCann*, No. 11-3613, 2013 WL 2481251, at

*3 (D.N.J. June 10, 2013); *see also Stewart v Kelchner*, 358 F. App'x 291, 294 n. 4 (3d Cir. 2009),

*pro se* status alone does not absolve a party from the requirements of Local Civil Rule 56.1(a), and

this Court retains the discretion to take the failure to file the required statement into account in

determining the outcome of the motions before it.   *See, e.g., Glazewski v. Corzine*, No. 06-4107,

2009 WL 5220168, at *1 (D.N.J. Dec. 31, 2009).

In this case, Plaintiff has not only failed to provide an adequate statement of facts, but also

has failed to provide any legitimate argument to establish a basis for his being granted summary

judgment.   Instead, Plaintiff simply rehashes his arguments regarding the appointment of counsel

that this Court has rejected time and again, and complains about the nature of discovery after the

time for such complaints has run.   (ECF No. 148 at 1-5).   Despite having the opportunity to file

a reply brief or to belatedly file a statement of material facts or argument as to his entitlement to

summary judgment, Plaintiff has chosen not to do so in his "reply" letters, wherein he again

attempts to dispute the denial of his counsel motions and essentially attempts to reassert new

claims, which have no bearing on the summary judgment motions before this Court.   Thus, while

this Court will excuse Plaintiff's failure to file a statement of material facts to the extent that it will

not treat Defendants' statement of facts as undisputed and will instead consider Plaintiff's

deposition as providing Plaintiff's version of the facts at hand in this matter, this Court will not

accept Plaintiff's woefully inadequate cross-motion for summary judgment which lacks a

statement of facts, argument, or any basis for the granting of the motion.   Thus, this Court will

deny Plaintiff's cross-motion for summary judgment as Plaintiff has provided no basis for the

granting of that motion, and has in any event failed to even attempt to comply with the procedural

rules applicable to his motion.

## C. Defendants' motion for summary judgment

Defendants argue they are entitled to summary judgment because they are entitled to qualified immunity in so much as Plaintiff has failed to establish that the Defendants have violated Plaintiff's clearly established constitutional rights.  "The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, (2011)).

In determining whether qualified immunity applies, courts engage in a two-pronged analysis.  *Id.*  "First a court must decide 'whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right'[, a]nd second, the Court must determine 'whether the right at issue was clearly established at the time of [the] defendants alleged misconduct.'"  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  Where it is dispositive of a plaintiff's claims, courts should address the clearly established prong first.  *Id.*  In addressing whether a claim is clearly established, the court must "frame the precise contours of [the] right" the plaintiff claims has been violated.  *Id.* at 638.  The Third Circuit has thus explained

> that courts are "not to define clearly established law at a high level of generality."  *al-Kidd*, 131 S. Ct. at 2084 (citations omitted). Instead, courts "must define the right allegedly violated at the appropriate level of specificity."  *Sharp v. Johnson*, 669 F.3d 144,

18

159 (3d Cir. 2012).   Accepting [a] broad version of the right at issue "would . . . convert the rule of qualified immunity that our cases plainly establish into a rule of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 [(1987)].   We are thus required to frame the right at issue "in a more particularized, and hence more relevant, sense," *Anderson*, 483 U.S. at 640, "in light of the case's specific context, not as a broad general proposition," *Saucier[ v. Katz*, 533 U.S. 194, 201 (2001)].

*Id.*

A right can only be considered clearly established either where there is applicable Supreme Court precedent on the issue, or where "existing precedent [has] placed the statutory or constitutional question *beyond debate*." *Id.* (quoting *al-Kidd*, 131 S. Ct. at 2083).   It remains an unsettled question whether "a robust consensus of cases of persuasive authority in the Court[s] of Appeals" is sufficient to clearly establish a right for qualified immunity purposes.   Thus, where "the firmly settled state of the law, established by a forceful body of persuasive precedent, would place a reasonable official on notice that his actions obviously violated a clearly established constitutional right," the plaintiff's claim is clearly established, and qualified immunity will not shield the defendant's conduct.   *Id.*

As all of the remaining Defendants in this matter are supervisory officials in the DOC, the question of whether Plaintiff has established a prima facie claim for the denial of a constitutional right largely rests on whether he has sufficiently shown that they were responsible for the alleged wrongs in their capacities as supervisors not involved in the specific day to day operations of the STU.   A § 1983 Plaintiff may not make out a claim for supervisory liability solely based on a respondeat superior theory of liability.   *See Iqbal*, 556 U.S. at 676; *see also Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988).   A "defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode*, 845 F.2d at 1207-08.   Thus, supervisory liability

generally can be established only by showing each supervisory defendant's participation in the alleged wrongs by showing that the "establishment of policies, practices or customs [by the supervisory defendant] directly caused the constitutional violation[,] [that the supervisor] participat[ed] in the violation of [the p]laintiff's rights, [that the supervisor] direct[ed] others to violate [the p]laintiff's rights, or [that the supervisor had actual] knowledge of and acquiesc[ed] to a subordinate's conduct."   *Doe v. New Jersey Dep't of Corr.*, Civil Action No. 14-5284, 2015 WL 3448233, at *9 (D.N.J. May 29, 2015) (quoting *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316-20 (3d Cir. 2014), *rev'd on other grounds*, 135 S. Ct. 2042 (2015)); *see also Tenon v. Dreibelbis*, 606 F. App'x 681, 688 (3d Cir. 2015) (§ 1983 Plaintiff pleading supervisory liability must establish defendant's "participation [in the alleged wrong], or actual knowledge and acquiescence, to be liable").

Where a Plaintiff's policy-based supervisory liability claim arises out of an alleged failure to train or correct the behavior of his subordinates, the Plaintiff must establish that the supervisor's actions "amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"   *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).   Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."   *Id.* (quoting *Bd. Of County Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). Thus, the inaction must be severe enough to be the "functional equivalent of a decision by the [supervisor] to violate the Constitution."   *Id.* at 61-62 (*Canton*, 489 U.S. at 395).   Generally, establishing deliberate indifference requires that the plaintiff show a "pattern of similar constitutional violations by untrained employees."   *Id.* at 62.

20

Based on the procedural history of this matter, the only claims which remain before this Court are Plaintiff's various Fourteenth Amendment conditions of confinement and equal protection claims (based on his inability to have a job absent treatment participation, the facilities phone and computer policies, the use of MAP status as a form of discipline, and the prison-like conditions at the STU facility), Plaintiff's Fourteenth Amendment deprivation of property claims, and Plaintiff's Fourth Amendment claims for improper searches of his property.   Before turning to Defendant's qualified immunity arguments for each of these claims, the Court must first note that, during his deposition, Plaintiff also testified as to numerous issues of specific conduct, most importantly the alleged attacks by Officers Cruz, Booker, and Caldwell, which occurred after the filing of the complaint in this matter in 2007.   Because those incidents occurred after the filing of the 2007 complaint, and because Plaintiff has not sought to amend or supplement his complaint to raise those claims, those incidents are not properly before this court.   *See, e.g., Caldwell v. Fogel*, No. 08-728, 2009 WL 3048558, at * 5 (W.D. Pa. Sept. 21, 2009); *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109 n. 9 (3d Cir. 2002) ("For the sake of clarity, a prisoner plaintiff (or any other plaintiff) should not be able effectively to amend a complaint through any document short of an amended pleading").   To the extent that Plaintiff seeks relief based on the alleged assaults and the like he suffered after the filing of the complaint, he would be required to file a separate action raising those claims, which it appears he has already done.   *See, e.g., Aruanno v. Booker*, 397 F. App'x 756 (3d Cir. 2010) (affirming dismissal of Plaintiff's lawsuit concerning the alleged assault by Officer Booker); *Aruanno v. Caldwell*, 637 F. App'x 675 (3d Cir. 2016) (affirming denial of counsel motion and dismissal of supervisory defendants, as well as entry of default against Officer Caldwell only in Plaintiff's suit regarding the alleged Caldwell incident).

21

The Court will now turn to Defendants' arguments as to each of Plaintiff's remaining claims.

### 1.   Plaintiff's Deprivation of Property Claims

Defendants argue that Plaintiff has failed to establish a constitutional violation in relation to his claim that residents and staff have either stolen or destroyed his property both because there is an adequate state remedy and because Plaintiff has failed to show that the named Defendants, all high level DOC supervisors, were sufficiently aware of the alleged occurrences that they can be said to have been deliberately indifferent to them.   As the Third Circuit has previously explained to Plaintiff, the wanton taking or destruction of a person's property by state actors does not provide a basis for relief under § 1983 where the state has provided an adequate post-deprivation remedy to address the loss.   *See Aruanno v. Johnson*, 501 F. App'x 151, 152-53 (3d Cir. 2012); *see also Love v. New Jersey Dep't of Corr.*, Civil Action No. 14-5629, 2015 WL 2226015, at *5 (D.N.J. May 12, 2015) (citing, inter alia, *Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984), for the proposition that there is no Fourteenth Amendment violation where a state actor deprives an individual of property without authorization and a meaningful post-deprivation remedy is available).   Thus, because New Jersey has provided a meaningful post-deprivation remedy, i.e. the New Jersey Tort Claims Act and the like, that Plaintiff's property was wrongfully damaged, stolen, or destroyed is insufficient to establish a constitutional violation, and Defendants are therefore entitled to qualified immunity as to Plaintiff's deprivation of property claims on that basis.[5]

---

[5] Although that conclusion alone is sufficient to establish that Defendants are entitled to summary judgment as to Plaintiff's deprivation of property claims, this Court is compelled to note that Plaintiff has also failed to provide any facts which would permit a rational fact-finder to

**2.  Plaintiff's Improper Search and Related Specific Instance of Conduct Claims**

Defendants also move for summary judgment as to all of Plaintiff's claims which arise from specific instances of conduct of Defendants subordinates, including the illegal search claims raised in Plaintiff's complaint as well as Plaintiff's claims during his deposition that he or his visitors were subjected to name calling, excessive uses of force, and abuse at the hands of guards at the STU facility.   Specifically, Defendants argue that Plaintiff has failed in any way to show that the named supervisory Defendants were aware of, let alone responsible for, the actions of their subordinates.   In his deposition, Plaintiff stated on at least two occasions that he did not believe that the named DOC Defendants were directly responsible for the actions of their subordinates, instead suggesting that the searches, verbal abuse, and attacks he suffered happened without their approval or knowledge.   Instead, Plaintiff stated that he believed Defendants were responsible only in relation to their failure to correct, train, or punish their subordinates.

The problem with Plaintiff's position is that Plaintiff has failed to in any way show that the DOC Defendants were aware of the conduct about which he was complaining, which essentially breaks the chain connecting their allege failure to train or adopt better policies and the alleged violations.   Indeed, Plaintiff's claims are additionally hampered by the timing of the incidents and his complaints about them.   Although Plaintiff has alleged certain specific instances of conduct,

---

conclude that the named supervisory Defendants were actually aware of the alleged violations, or that they were deliberately indifferent to a pattern or practice of such violations based on any actions which occurred prior to the filing of the complaint in this matter.   That Plaintiff has so failed likewise establishes that Plaintiff has failed to show a constitutional violation by these Defendants, and would thus require that Defendants be granted summary judgment.   *See Doe*, 2015 WL 3448233 at *9; *see also Connick*, 563 U.S at 61-62.

only one of those instances, the alleged incident where he was confronted and threatened by a guard smuggling contraband into the facility, occurred prior to the filing of this complaint. Likewise, Plaintiff admitted that Defendants were not aware of this conduct until, at the earliest, he filed complaints regarding the conduct.   Thus, those factual details Plaintiff does provide further support the conclusion that Defendants were not aware of the alleged instances of conduct prior to the filing of Plaintiff's complaint.

Plaintiff has provided nothing more than his own assertions to support his contention that Defendants should have been aware of these incidents, and has certainly failed to provide facts which would permit a rational fact-finder to conclude that Defendants were or should have been aware of the alleged bad acts on the part of STU staff and/or residents, and were thereafter deliberately indifferent to a pattern or practice of bad conduct which occurred prior to the filing of the complaint in this matter.   Indeed, absent the allegations of conduct which occurred after 2008 (the Booker incident, the Cruz incident, the searches between 2008-2010, and the Caldwell incident), Plaintiff has failed to provide even his own testimony regarding specific instances of such conduct which could be said to place high-level supervisors on notice that their policies were insufficient and that further training, rule changes, or the like were necessary to curb bad actors from violating the constitutional rights of the SVPs.   Plaintiff has thus failed to provide sufficient proof that a reasonable factfinder could find that Defendants were or should have been aware of the alleged conduct, let alone that they were deliberately indifferent to such conduct.   *Connick*, 563 U.S at 61-62; *Doe*, 2015 WL 3448233 at *9.   Even when viewing the facts in the light most favorable to Plaintiff, Plaintiff has provided no real evidence which would permit a rational factfinder to infer that the named DOC Defendants were aware of and deliberately indifferent to

the conduct in question, and a rational factfinder could thus not conclude that Plaintiff has shown that Defendants violated his constitutional rights.   *Connick*, 563 U.S at 61-62; *Doe*, 2015 WL 3448233 at *9.   As such, Defendants are entitled to qualified immunity as to Plaintiff's illegal search claims and related claims based on alleged specific instances of conduct by Defendants' subordinate officers.   *Spady*, 800 F.3d at 637.


### 3.   **Plaintiff's Conditions of Confinement Claims**

Defendants move for summary judgment as to Plaintiff's remaining claims, all challenging the conditions of confinement at the STU facility, arguing that, to the extent such conditions could even be said to be a constitutional violation, such a violation was not clearly established when the complaint was filed in 2007.   "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."   *Youngberg v. Romero*, 457 U.S. 307, 321-22 (1982).   As such, civilly committed SVPs "may not be subject to conditions that amount to punishment . . . within the bounds of professional discretion."   *Williamson v. Davis*, No. 14-5770, 2015 WL 2412197, at *4 (D.N.J. May 19, 2015); *see also Bell v. Wolfish*, 441 U.S. 520, 536 (1979); *Youngberg*, 457 U.S. at 321-22.   A determination as to whether a given condition amounts to improper punishment thus requires a court to balance the rights and interests of the civilly committed individual with the reasons for the restrictions put forth by the State.   *Williamson*, 2015 WL 2412197 at *4; *see also Youngberg*, 457 U.S. at 320.   In order to comport with Due Process, the conditions of confinement must "bear some reasonable relation to the purpose for which persons are committed."   *Seling v. Young*, 531 U.S. 250, 265 (2001).

As both the New Jersey Courts and the SVP Act have made clear, SVPs are confined to "a secure facility for control, care and treatment, N.J. Stat. Ann. § 30:4-27.26(b), and the statute was thus intended both to ensure the secure confinement of dangerous individuals and the treatment of those individuals in order to reduce or remove the threat they pose to others. *Williamson*, 2015 WL 2412197 at \*4; *see also In re civil commitment of J.H.M.*, 845 A.2d 139, 145 (N.J. App. Div. 2003). Thus, where a DOC policy applicable to SVPs is rationally related to either maintaining secure control over the SVPs or to providing them with treatment, that policy will withstand constitutional scrutiny. *Williamson*, 2015 WL 2412197 at \*4; *see also Seling*, 531 U.S. at 265.

Plaintiff's chief complaint is essentially that he is confined in a building that formerly served as a prison unit which is designed and constructed to prevent escape, under conditions similar to those endured by prisoners, and is subject to prison-like security procedures such as shackling during transportation outside the facility and lock downs when security issues arise. As the Seventh Circuit has explained,

> detainees may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not be punished. *See Allen* [*v. Illinois*, 478 U.S. 364, 373-74 (1986)]. Does placement in a prison, subject to the institution's usual rules of conduct, signify punishment? The answer, given by *Bell v. Wolfish*, [441 U.S. at 536,] is no. *Wolfish* held that pretrial detainees, who like civil committees may be held for security reasons but not punished, may be assigned to prisons and covered by the usual institutional rule, which are designed to assure safety and security. . . . If pretrial detainees may be subjected to the ordinary conditions of confinement, as *Wolfish* holds, then so may persons detained . . . as sexually dangerous persons.

*Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003); *see also Williamson*, 2015 WL 2412197 at \*4-5 (applying *Allison* to civilly committed individuals detained under the SVP Act). As SVPs can be held in a secure prison-like facility designed to prevent escape and to maintain secure

control, it follows that policies, including the placement of SVPs in the secure STU, secured as it is with razor wire and the like and subject to shackling during transport both does not violate a clearly established constitutional right and is in any event rationally related to the purpose of the SVP Act in so much as it is designed to maintain secure confinement and control over the SVPs during their treatment, and thus would not be violative of the constitution.   *Seling*, 531 U.S. at 265; *Allison*, 332 F.3d at 1079; *Williamson*, 2015 WL 2412197 at *4-5.   As such, Defendants did not violate a clearly established constitutional right of Plaintiff by confining him to a secure, prison-like environment and subjecting him to security controls such as shackling during transportation, secure walls lined with razor wire or the like, and subjecting SVPs to lock down events when security concerns arise.   Thus, Defendants are entitled to qualified immunity and in turn summary judgment as to Plaintiff's policy claims based on his confinement in a prison-like environment.

Plaintiff's equal protection claims must fail for similar reasons.   To the extent that Plaintiff has raised an equal protection claim other than his claims of specific acts of favoritism by STU staff members, Plaintiff's equal protection claim is essentially that the treatment of SVPs in the STU is different from the treatment of civilly committed mental patients at other facilities.   To make out an equal protection claim, a plaintiff must show that he is "a member of a protected class and was treated differently from [others not belonging to that class], or [that] he belongs to a 'class of one' and was treated differently from others similarly situated without any rational basis for the difference in treatment."   *Wofford v. Lanigan*, No. 14-5723, 2015 WL 9480016 (D.N.J. Dec. 28, 2015) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 563 (2000)).   Plaintiff has not attempted to show that he is being treated differently on the basis of his being a member of a protected class,

but essentially that SVPs are treated differently from other civil committees without a rational basis.  In support of this, Plaintiff has provided nothing but his own deposition testimony that some visitation rules are more lax in other facilities, and other facilities are not as secure.   These differences in treatment, however, have a rational basis – SVPs are committed not only because of mental issues, but also because of a history of sexually violent behavior, and their commitment is designed not only to provide treatment, but also to provide secure confinement until that treatment has been completed.   *Williamson*, 2015 WL 2412197 at *4-5.   As there is a rational basis for the difference in treatment, and as Plaintiff has failed to provide evidence of the difference in treatment other than his own assertions and hearsay from other detainees, Plaintiff has failed to provide facts from which a rational fact-finder could conclude that he has suffered an equal protection violation. Defendants are therefore entitled to qualified immunity on Plaintiff's equal protection claims as the facts presented do not establish a constitutional violation occurred here.

Defendants contend that they should also receive qualified immunity as to Plaintiff's claim that being subject to MAP placement violates his rights as it is equivalent to a prison disciplinary system.   This Court agrees.   Although MAP placements are certainly similar in some ways to prison disciplinary systems, Plaintiff has presented no cases suggesting that this in and of itself is sufficient to establish that MAP violates his constitutional rights.   Indeed, available case law suggests the opposite.   *See M.X.L. v. New Jersey Dep't f Human Servs.*, 876 A.2d 869, 873-74 (N.J. App. Div. 2005); *see also Marcum v. Harris*, 328 F. App'x 792, 794 (3d Cir. 2009) (citing *M.X.L.* for the proposition that MAP is a therapeutic program designed to explore a detainee's disruptive behavior through therapy).   In any event, it is quite clear that the MAP program, as designed and explained in the STU handbook is rationally related to the therapeutic and security

28

concerns of the facility.   As that rule book explains in the passages discussed above, MAP is designed to control disruptive behavior by detainees and is further used to help detainees gain control of their disruptive impulses such that they can more properly engage in the treatment programs offered by the STU.   MAP placements are thus designed to foster a more therapeutic environment by curtailing violent or anti-social behavior as well as to provide therapy to detainees to prevent such behavior in the future, and to ensure the safety and security of both the detainee himself and the other SVPs who could be impacted by his behavior.   Thus, it appears that the MAP program is rationally related to the legitimate therapeutic and security interests of the facility, and the program policies therefore do not violate the constitution.   At the very least, it is certainly not clearly established that the MAP program violates Plaintiff's rights, and as such Defendants are entitled to qualified immunity as to Plaintiff's MAP claim.

Defendants also argue that they did not violate Plaintiff's clearly established rights by denying him a cell phone and more access to a computer and the internet.   As Petitioner himself admitted, there are known problems in the STU with child pornography, fraudulent and criminal phone calls, and the like.   Thus, it is clear, and Plaintiff has essentially acknowledged, that the facility has clear security interests in restricting the ability of its residents to have unfettered phone and internet access.   While so recognizing, the facility still provides its residents with a bank of twelve pay phones for them to use, as well as monitored programs during which SVPs may access computers and the internet under the supervision of treatment personnel.   Thus, it is clear that these restrictions have a rational relation to the dual purposes of the SVP Act – secure confinement and the treatment of sexually violent predators – and thus are constitutionally valid.   *Williamson*, 2015 WL 2412197 at *4; *see also Seling*, 531 U.S. at 265; *Salerno v. Corzine*, No. 06-3547, 2013

WL 5505741, at *6-7 (D.N.J. Oct. 1, 2013); *Aruanno v. Main*, No. 07-3687, 2010 WL 251590, at

*9 (D.N.J. Jan. 15, 2010) (SVPs do not possess unlimited phone access rights, and reasonable

restrictions may be placed on their telephone privileges).   Indeed, because the facility attempts to

balance the rights of the facility residents to communicate with those outside of the STU by

providing phone access and monitored access to computers, these regulations are more than

sufficient to survive rational basis scrutiny.   Defendants are thus entitled to qualified immunity as

to these policies as Plaintiff has failed to provide any facts which would permit a rational fact-

finder to find that the policies violate his constitutional rights, and has certainly failed to establish

that any such violation is clearly established by the case law.[6]

Plaintiff's claims arising out of the STU's visitor policies fair no better.   To the extent that

Plaintiff bases these claims on harassment by specific officers, those claims would fail for the

reasons explained above – Plaintiff has failed to provide any facts from which a reasonable fact-

finder could conclude that the named DOC Defendants were aware of, let alone deliberately

indifferent to, those specific instances of conduct, which were only vaguely alluded to by Petitioner

during his deposition.   To the extent Petitioner attacks the policies themselves, which he may feel

are overly onerous, that the facility restricts the types of clothing worn by visitors, in this case

Plaintiff's female family members, is rationally related to maintaining secure control over the

detainees in a facility which houses individuals who are detained for their propensity for sexual

---

[6] In the original complaint, Plaintiffs also asserted that there were issues with facility personnel
reading the prisoner's mail.   In his deposition, however, Plaintiff conceded that he did not have
those problems and that he did not have any claim based on interference with his rights to the
mail.   (Plaintiff's Dep. at 39).   As Plaintiff has conceded that he has not suffered any such
violation, and as Plaintiff is the sole remaining Plaintiff, that claim has essentially been
withdrawn and this Court need not address it further.

violence.   Likewise, the seizure of a picture of Plaintiff's sister's child, to the extent that claim is based on an undefined policy rather than a specific instance of wrongful conduct, would clearly be rationally related to both security and therapeutic goals as the potential for the misuse of such pictures by those individuals held in the STU based on sexual offenses against children and those with child pornography issues is readily apparent.   Although these restrictions may affect Plaintiff's right to communicate with his family during in person visits and in so much as he may not keep pictures of the children in his family, those restrictions are rationally related to the dual purposes of the SVP Act and are thus constitutionally permissible.   In any event, Plaintiff has presented no basis from which this Court could conclude that such an alleged violation is clearly established in the case law, and this Court must therefore grant Defendants qualified immunity.

Plaintiff's final policy claim is his assertion that Defendants' policies violate his rights as he is denied a job so long as he refuses to comply with group therapy and is prevented from starting his own business.   The reason Plaintiff is denied a job, however, is because he has refused treatment, and thus the rule providing that detainee jobs are a privilege given only to those who participate in treatment is the source of his inability to maintain a job at the STU.   This rule is clearly rationally related to the legitimate interests of the facility – incentivizing the treatment of SVPs, many of whom, like Plaintiff, may be otherwise disinclined to participate in treatment at the facility – and thus is constitutionally valid.   *Williamson*, 2015 WL 2412197 at *4; *see also Seling*, 531 U.S. at 265.   In any event, the deprivation of a job or a reduction in job opportunities to a civil detainee whose basic needs are provided for is not a sufficient hardship to impugn the detainees constitutional rights and thus is insufficient to show that a detainees rights have been violated.   *Salerno*, 2013 WL 5505741, at *10-11.   Thus, that Plaintiff is denied a job because he

refuses treatment is not a violation of Plaintiff's constitutional rights, a point the Third Circuit has explained to Plaintiff previously. *See Aruanno v.Velez*, 500 F. App'x 126, 128 (3d Cir. 2012); *Aruanno v. John/Jane Does 1-10*, 536 F. App'x 167, 169 (3d Cir. 2013).

To the extent that Plaintiff instead contends that he should be permitted to start his own business separate and apart from an institutional job, such a claim likewise fails to establish a constitutional violation. Detainees, even those who are not currently held pursuant to a criminal conviction, do not have a constitutional right to employment. *See, e.g., Ellis v. Rodriguez*, No. 04-6118, 2005 WL 1475595, at *7-8 (D.N.J. June 22, 2005). It follows that they likewise have no constitutional right to start a business of their own which would permit them to make deals and interact with people outside of the facility in which they are housed or even with those confined with them, as such interactions would clearly impact the valid and rational institutional interests in maintaining secure control over detainees as well as the institutional and therapeutic interests the facility has in retaining the use of detainee jobs as a form of reward for therapeutic progress. *Id.*; *Williamson*, 2015 WL 2412197 at *4. As such, Plaintiff's contention that he has been denied the right to start a business of his own is insufficient to show that he has suffered the violation of his constitutional rights, and is certainly insufficient to show that Defendants violated a clearly established right, and Defendants are entitled to qualified immunity as a result. As Defendants are entitled to qualified immunity as to all of Plaintiff's claims, summary judgment shall be entered in their favor as to all of Plaintiff's claims.

**D. The Fictitious Defendants**

As the only named Defendants in this matter after its reopening, the DOC Defendants, will be granted summary judgment, only the fictitious John and Jane Doe Defendants would remain in this matter.   With the exception of a comment during his deposition related to a specific instance of conduct which occurred after the filing of his current complaint, Plaintiff has made no efforts to actually name any individuals in the place of these fictitious Defendants, and that one comment in Plaintiff's deposition is insufficient to correct that problem, *see Grayson*, 293 F.3d at 109 n. 9. In any event, Plaintiff's time for amending his complaint to name such Defendants had passed before his deposition, and has certainly passed as discovery in this matter has concluded and the remaining named Defendants are being granted summary judgment.   Where a plaintiff fails to name actual defendants in place of fictitious parties after a reasonable period of discovery, the court may dismiss the fictitious defendants in that matter.   *See Baker v. U.S. Marshal Serv.*, No. 12-494, 2015 WL 377042, at * 5 (D.N.J. Jan. 28, 2015).   Plaintiff has utterly failed to amend his complaint to name identifiable individuals in place of the fictitious defendants, and discovery has, as noted, concluded.   As this Court is entering summary judgment in favor of the remaining named Defendants, and as Plaintiff has failed to name any individuals in place of the fictitious parties, this Court will dismiss Plaintiff's claims against the fictitious parties at this time, and will close this matter as all claims and parties have now been disposed of either through summary judgment, the *Alves* settlement, or the dismissal of the fictitious parties.

## III. CONCLUSION

For the reasons stated above, this Court grants Defendants' motion for summary judgment, denies Plaintiff's counter-motion for summary judgment, and will dismiss Plaintiff's claims

33

against the fictitious Defendants.   An appropriate order follows.


                                                    ___*s/ Susan D. Wigenton*___
August 1, 2016                               Hon. Susan D. Wigenton,
                                                    United States District Judge